UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAMUEL JOSEPH CUTRUFELLI,

               Petitioner,

     v.

C. KOENIG,[1]

            Respondent.

Case No. 20-cv-05928-EMC

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

## I.     <u>INTRODUCTION</u>

Samuel Cutrufelli, a prisoner currently incarcerated at Correctional Training Facility in Soledad, filed this *pro se* action for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed an answer and Mr. Cutrufelli has filed a traverse. Mr. Cutrufelli's petition is now before the Court for review on the merits. For the reasons discussed below, the petition for writ of habeas corpus will be **DENIED**.

## II.     <u>BACKGROUND</u>

### A.    <u>The Crime</u>

The California Court of Appeal described the crime as follows:

*1. The Prosecution's Case*

At about 11:00 a.m. on January 4, 2012, 90-year-old Jay L. (J.L.) was in his bedroom at his house in Greenbrae, California, when he heard a loud crash. He walked down his hallway to see what was

---

[1] C. Koenig, the previous warden of Correctional Training Facility, where Mr. Cutrufelli is incarcerated, was originally named as the respondent in this action. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Luis Martinez, the current acting warden of Correctional Training Facility, will be substituted as respondent in place of Mr. Cutrufelli's prior custodian.

going on. A man, later identified as defendant, approached and put a .45-caliber semiautomatic pistol to J.L.'s head. J.L. thought his life was over.

Defendant said, "There's a contract out on you." J.L. was surprised and said it "sounds like mafia days or something." Defendant asked, "You're the man with all the fancy cars? Let's go see the fancy cars." J.L. and defendant walked to the garage, and J.L. showed defendant that his cars were not fancy.

Keeping the gun pointed at J.L.'s head, defendant ordered J.L. to go to his bedroom and said he wanted all of J.L.'s valuables. Defendant tied J.L.'s hands behind his back with a belt, put a coat over J.L.'s head, went through J.L.'s things, and took $70 from a money clip.

J.L. was able to release the belt from his hands, and defendant took the cover off J.L.'s head; J.L. then came up with a plan. He stood up and said, "I've got to take a shit." Defendant said, "You can't do that," but J.L. responded, "But I have to," and pulled his pants down. Defendant said, "Stop," and told J.L. to use the bathroom.

J.L. kept four guns in the bathroom, including a .38-caliber revolver that he kept loaded for emergencies. He retrieved the revolver, flushed the toilet, and opened the bathroom door. He hoped defendant would surrender once he saw J.L. with a gun, but as soon as J.L. peeked into the bedroom closet where defendant was, defendant fired his gun, shooting J.L. in the face.

J.L., who had learned to use guns during the 15 years he was in the Sheriff's Air Patrol, used his training to shoot defendant in the right shoulder. Defendant shot back twice, barely missing J.L.'s head and leg. J.L. also shot back, hitting defendant twice in his stomach and once in his leg.

J.L. had to pull the trigger each time he fired a shot because it was a single-action weapon. As the two men fired shots at each other, J.L. said, "Fuck you, you son of a bitch. It's my turn." Defendant responded, "Don't kill me. I have two children. Please, don't kill me."

Defendant, who is "a big guy," then charged at J.L. and knocked him to the floor. He wrested J.L.'s revolver from him, placed it against J.L.'s temple, and pulled the trigger. The gun went "'[c]lick.'" There were no bullets left in the gun because J.L. had been trained to use every bullet "'so your enemy cannot use it on you and kill you.'"

Defendant appeared startled and left. Blood was dripping out of J.L.'s head "like a [faucet]." J.L. called 911 and staggered outside through the garage when he heard police sirens. There, he met police officers, who told him to hold his hands up. J.L. complied and said, "It's not me."

J.L. was taken to Marin General Hospital, then to Kaiser, where he stayed for "a long time[.]" He had a gunshot wound to his left cheek and a wound to his neck. A doctor opined the wounds were life-

2

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

threatening. His jaw was still hurting at the time of trial, and he was unable to chew anything hard or talk for long periods of time.

J.L. identified photographs of various items that were taken from his home, including his cell phone, watches, glasses, cuff links, a charm, and a money clip. He testified that defendant also damaged the front door of the house when he broke into the home.

J.L. had two housemates—S.N., who lived in the lower unit of the house, and G.L., who lived in a room in J.L.'s unit. S.N. testified she heard a loud bang and strange noises coming from J.L.'s bedroom. When she ran upstairs, she saw a chair propped against the door to prevent entry. S.N. called out, "Jay, Jay, Jay," and heard J.L. say, "No, no." S.N. ran downstairs, called 911, and hid under the porch. As she hid, she heard gunshots. S.N. left the house after police arrived. When she returned the next day, she saw a hole in the ceiling and on her desk.

G.L. was not home at the time of the incident. She had left the house about 30 minutes before the incident and had locked the front door. She did not know defendant and had not given him or anyone else permission to enter the home.

At about 11:00 a.m. the same day, contractor M.T. was working in San Rafael, about a quarter-mile from J.L.'s house, when he heard two long horn blasts. He looked up and saw a black Lexus. M.T. approached the Lexus and asked the driver—defendant—what was wrong. Defendant was bleeding and said, "I have been shot." M.T. called 911. Defendant tried to drive away but M.T. stopped him. Paramedics came, removed defendant's clothing, and took him away in an ambulance.

Marin County Deputy Sheriff Adam Brown was dispatched to San Rafael in response to M.T.'s 911 call. When he arrived, he saw a black Lexus with traffic collision damage on the front right side. Defendant was bleeding from his right upper arm and had blood on his face. He was moaning in pain and said he had shot himself.

Brown saw a pistol holster in defendant's waistband and a knife in his front pocket. Brown asked where the gun was, and defendant pointed to a revolver that had blood on it. Brown placed the gun on the trunk of the Lexus. Another deputy sheriff secured the gun in his patrol car and took photographs of defendant's injuries, including bullet wounds to his right leg, right arm, right back, and right side of his chest. Defendant said he had been shot in the arm, hip, and leg, and wanted to call his girlfriend before he died. Defendant said the automobile damage was old.

Crime scene investigator Edmund Rudolph collected various items from the Lexus, including a .38-caliber handgun, a handgun holster, a pocketknife, clothing, keys, and defendant's driver's license. The gun's cylinder contained five fired cartridge casings; there was no live ammunition in the gun. The numbers engraved on the handgun matched J.L.'s driver's license number. Rudolph also recovered bags containing jewelry, electronic equipment, and personal items from the Lexus. Rudolph determined that defendant's stepmother

3

was the registered owner of the car.

Rudolph also searched J.L.'s house and the surrounding neighborhood and recovered a latex glove in the roadway, next to a blood trail that came from inside the house. The wood was split on the front door, consistent with the door having been kicked. Drawers in the master bedroom were wide open and the closet appeared to have been ransacked. There were a rolled-up belt, a bullet hole in the comforter, a box with unfired ammunition, and a box that contained three firearms. There was a spent .38-caliber bullet casing in the bathroom. There were a .45-caliber semiautomatic pistol (plus three fired bullet casings and two bullet projectiles from this pistol) and two expended .38-caliber bullets in the master bedroom closet. A third .45-caliber bullet projectile was found downstairs. A path of blood drops went from the master bedroom to the front foyer, through the kitchen and garage to the outside of the house. A technician who assisted in cleaning J.L.'s house found a bullet on the master bedroom closet floor and placed it in a plastic bag.

An expert latent print analyst was unable to find usable fingerprints on the guns or on the stolen items recovered from the Lexus. The analyst found defendant's left thumbprint on the magazine for the .45-caliber pistol.

A ballistics expert opined that the .38-caliber revolver was functional and the .38-caliber bullets that were recovered from J.L.'s house came from that revolver. The .45-caliber pistol was also functional, and the .45-caliber cartridge casings recovered from the scene were fired by that weapon. The expert said it was inconclusive whether the .45-caliber spent bullets that were recovered were fired by the .45-caliber pistol.

A criminalist found some blood on various parts of the .38-caliber revolver and the .357-caliber revolver. An expert in DNA analysis examined the DNA samples and found J.L.'s DNA on the .357-caliber revolver. He found that defendant was the major contributor of DNA found on the .45-caliber pistol. The .38-caliber revolver had J.L.'s DNA as a major profile as well as a mix of defendant's and J.L.'s DNA. Blood on a bedspread matched defendant's DNA profile, and a glove recovered from the scene matched defendant's DNA as the major profile and J.L.'s DNA as a minor profile. A swab from the interior bedroom closet door matched defendant's DNA.

The chief of the radiology department at Marin General Hospital reviewed defendant's X-rays and CT scan taken on the day of the incident. Defendant had an intact bullet in his thoracic cavity and had several fractured ribs that were not likely caused by a bullet.

Twin Cities Police Detective Michael Mejia identified two wounds to defendant's knee. Defendant had an entrance wound to his right shoulder and no exit wound. He also had an entrance wound to the lower right side of his body and an exit wound to his lower rear back. Mejia acknowledged that entry and exit wounds can look very similar.

4

K.M., who lives a block away from J.L., testified that about 10:00 a.m. on the day of the incident, a man rang her doorbell and asked for "Jimmy." K.M. thought the man was looking for a neighbor whose first name is Jim, and told the man that the neighbor was not there. Video surveillance footage from K.M.'s home showed a man walking near J.L.'s house wearing clothing that matched what defendant was wearing that day. The man had his hand on his waistband, which a deputy sheriff testified was consistent with him carrying a gun. The man's shoes matched the shoes that were recovered from the Lexus. A black Lexus with the same front-end damage as defendant's Lexus drove on the street. K.M. identified defendant's photograph in a lineup and said she was "10 percent sure" of her identification.

S.F., whose house is across the street and up the hill from J.L.'s house, also had video surveillance equipment that captured a black car driving into J.L.'s driveway at about 10:08 a.m. on the day of the incident and pulling away from the house at about 10:47 a.m.

The parties stipulated that defendant had a prior felony conviction and that he was not impaired by alcohol at the time of the incident.

The prosecution also presented evidence that T.C., a neighbor and friend of defendant, purchased a .45-caliber semiautomatic pistol in September 2007 and showed it to defendant. On January 1, 2012, T.C. returned home after spending the New Year's holiday away with family and realized his house had been burglarized. The side door to his garage had been kicked in, and his scuba dive vest, his and his mother-in-law's laptops, a television, jewelry, and guns—including the .45-caliber pistol he had shown to defendant—were missing. T.C. reported the theft to police the same day.

A few days later, T.C. saw a television report about defendant and the incident at J.L.'s house and contacted the Twin Cities Police Department because he knew defendant was not allowed to have guns. T.C. went to San Rafael where the police showed him a black Lexus, which he recognized as belonging to defendant's mother-in-law. Inside the trunk and passenger compartment of the Lexus, T.C. found his scuba dive vest, his and his mother-in-law's laptops, and other items that had been taken from his home. T.C. identified the .45-caliber semiautomatic pistol found in J.L.'s house as his. T.C. had not given defendant permission to possess any of the items in the Lexus or his gun.

*The Defense*

J.B. testified that he was friends with defendant and T.C. and that the three of them would ride their motorcycles together a couple of times a month. During one outing, the three of them talked about how defendant had received new gear from his insurance company after he was involved in a motorcycle accident. T.C. said that all of his belongings were insured and that it would be nice to get "all new stuff and money ...."[2]

> 2. T.C. received insurance money for the items that were stolen from his home, but he denied discussing any scheme

5

to falsely report items missing to his insurance company in order to collect payment.

B.M., an Oakland attorney, dated defendant from July to October 2010. One day, B.M. followed defendant, who was riding his motorcycle, to a house in Greenbrae to get the motorcycle repaired. The house was on the same street on which J.L. lives. They dropped the motorcycle off and stopped at another house on that street to look at a car. B.M. believed this house was on the corner (where J.L.'s house was). There, defendant talked to an older man who was working on a white, collector-type car in his garage.

Defendant's father testified that he was a contractor and that he and defendant sometimes worked together. In September 2011, defendant asked him to take him to Greenbrae to look at a house. Defendant went inside J.L.'s house and came out a half-hour later. The next week, defendant's father got his contractor tools together, and he and defendant drove back to J.L.'s house. Defendant went inside J.L.'s house and came out a half-hour later, "stoned" and "messed up." Later that day, defendant's father found white powder, a syringe, and a spoon in the tool bag he had taken with him. Defendant's father had seen defendant on drugs before and believed defendant obtained the drugs from J.L.'s house.[3]

3. J.L. and his housemates denied they ever used or sold illegal drugs. The police detective who searched J.L.'s house found no evidence of drugs.

Dr. Edward Alfrey, who treated defendant on the day of the incident, testified that defendant had gunshot wounds to his back, right shoulder, right chest and left leg. As a trauma doctor, Dr. Alfrey had experience seeing gunshot wounds, but his job did not include the determination of whether a wound was an entry or exit wound. In general, a small wound is an entry wound, but it is hard to tell if a wound is an entry or exit wound unless one hole is small and the other is large. Because defendant's wound to the back was a small hole, Dr. Alfrey believed it was an entry wound.

*People v. Cutrufelli*, No. A138685, 2019 WL 1198874, at *2-5 (Cal. Ct. App. Mar. 14, 2019).

B.   Procedural History

On October 31, 2012, a jury found Mr. Cutrufelli guilty on all counts: Count 1, attempted murder of Jay Leone (Cal. Penal Code §§ 664, 187(a)), with the special findings that Mr. Cutrufelli used a Springfield .45 caliber handgun, inflicted great bodily harm upon Mr. Leone, who was not an accomplice and was over 70 years old, and personally and intentionally discharged a firearm which proximately caused great bodily injury to a person other than an accomplice (Cal. Penal Code §§ 12022.5(a), 12022.7(c), 12022.53(d)); Count 2, first-degree robbery (Cal. Penal Code § 211), with the same three special findings; Count 3, first-degree

burglary (Cal. Penal Code § 459), with the special findings that another person was in the residence and that Mr. Cutrufelli used a firearm, and inflicted great bodily injury (Cal. Penal Code §§ 667.5(c)(21), 12022.5(a), 12022.7(c)); Count 4, assault with a semiautomatic firearm, (Cal. Penal Code § 245(b)), with a special findings of use of a firearm and infliction of injury (Cal. Penal Code §§ 12022.5(a), 12022.7(c));  Count 5, illegal possession of a firearm (Cal. Penal Code § 29900(a)(1)), with special findings of use of two different firearms, a .45 caliber semiautomatic handgun and a .38 caliber handgun, and infliction of injury (Cal. Penal Code §§ 12022.5(a), 12022.7(c)); Count 6, attempted murder of Jay Leone with a .38 caliber handgun; and Count 7, felony receiving stolen property (Cal. Penal Code § 496(a)).  Docket No. 11-2 at 146-164.  The trial lasted for 16 days, after which the jury deliberated for approximately one day before returning a verdict. *See id.* at 134-42.

On May 10, 2013, the court sentenced Mr. Cutrufelli to 86 years and 4 months to life in prison.  Docket No. 11-2 at 598.  On March 14, 2019,[2] the California Court of Appeal "remanded for the limited purpose of allowing the trial court to exercise its discretion to consider whether to strike one or more of the firearm use and/or serious felony enhancements . . . and affirm[ed] the judgment in all other respects." *Cutrufelli*, 2019 WL 1198874 at *1.  On May 22, 2019, the California Supreme Court summarily denied review.  Docket No. 11-11 at 3.

Mr. Cutrufelli then filed this federal habeas petition, to which he attached portions of appellate counsel's brief to the California Court of Appeal, on August 24, 2020.  *See* Docket No. 1.  The petition for writ of habeas corpus in this action alleges that Mr. Cutrufelli was deprived of effective assistance of because counsel was (1) operating with a conflict of interest and (2) failed to adequately impeach Jay Leone; (3) Mr. Cutrufelli was denied his Fifth, Sixth, and Fourteenth

---

[2] This Court takes judicial notice of the California Court of Appeal docket for Mr. Cutrufelli's direct appeal, number A138685.  *See Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051 n.3 (9th Cir. 2005) ("Materials from a proceeding in another tribunal are appropriate for judicial notice").  Mr. Cutrufelli filed his notice of appeal on May 20, 2013.  The appeal was fully briefed by April 25, 2014 and oral argument was waived.  Mr. Cutrufelli's appellate counsel filed a letter on April 20, 2016 noting that the case had been pending for nearly two years.  Counsel for the non-party victim filed a letter requesting an opinion on October 31, 2016, and again on February 24, 2017.  The parties filed supplemental briefing in February and March 2018 and again in October and November 2018.

1  Amendment right to testify on his own behalf; (4) the trial court denied his Sixth and Fourteenth

2  Amendment right to a fair and impartial jury by refusing to unseal juror contact information.  *Id.* at

3  5-6.

### III.    JURISDICTION AND VENUE

5  This Court has subject matter jurisdiction over this action for a writ of habeas corpus under

6  28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition

7  concerns the conviction and sentence of a person convicted in Marin County, California, which is

8  within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.    STANDARD OF REVIEW

10  This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

11  custody pursuant to the judgment of a State court only on the ground that he is in custody in

12  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

13  The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254

14  to impose new restrictions on federal habeas review.  A petition may not be granted with respect to

15  any claim that was adjudicated on the merits in state court unless the state court's adjudication of

16  the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application

17  of, clearly established Federal law, as determined by the Supreme Court of the United States; or

18  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

19  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

20  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

21  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

22  the state court decides a case differently than [the] Court has on a set of materially

23  indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

24  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

25  the state court identifies the correct governing legal principle from [the Supreme] Court's

26  decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

27  "[A] federal habeas court may not issue the writ simply because that court concludes in its

28  independent judgment that the relevant state-court decision applied clearly established federal law

United States District Court
Northern District of California

United States District Court
Northern District of California

erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court, if there is a reasoned decision.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).  When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## V.       DISCUSSION

A.      Ineffective Assistance: Trial Counsel's Conflict of Interest

Mr. Cutrufelli argues that trial counsel Sanford Troy had a conflict of interest because he filed a civil suit for negligence on Mr. Cutrufelli's behalf, without his permission, against the victim Jay Leone during the trial.  Docket No. 1 at 9.  Mr. Cutrufelli's public defender, Kathleen Boyle, who preceded Mr. Troy and then later again represented Mr. Cutrufelli after trial, filed a motion for a new trial arguing that Mr. Troy's conflict deprived Mr. Cutrufelli of effective assistance because of the negative publicity the civil suit generated.  *Id.*

The California Court of Appeal rejected this claim:

> a. *Conflict of Interest*
>
> (1) *Background*
>
> In his motion for a new trial, defendant argued, among other things, that his trial counsel had a conflict of interest that affected his ability to represent him because counsel filed a civil negligence action against J.L. on defendant's behalf during the criminal trial, without defendant's knowledge or consent. Defendant claimed he was prejudiced because the lawsuit received negative publicity and jurors might have seen newspaper headlines or articles about it that were published during the criminal trial.
>
> Defendant submitted various documents in support of his motion, including his declaration, a copy of the civil lawsuit in which defendant claimed J.L. caused him to suffer injuries and financial loss by negligently shooting him, a Marin Independent Journal

article entitled *Shooting defendant files lawsuit*, and three online articles from the same journal entitled *Greenbrae shooting defendant sues 90-year-old man who was shot*, *Lawyer who sued 90-year-old Greenbrae shooting victim calls social-media criticism unfair*, and *Greenbrae gunman who sued 90-year-old victim leads top 10 web stories for 2012*. Three of the articles came out during or around the time of the criminal trial, and counsel was attributed in one of them as saying that defendant was a methamphetamine user, the incident was the result of "a drug deal gone sideways," and that J.L. shot defendant in the back as he fled.

The prosecutor argued the civil lawsuit did not affect the criminal trial, as there was no evidence the jurors disobeyed the trial court's admonition not to look at media coverage during the trial. The prosecutor also argued the articles contained information that was consistent with the defense theory.

The trial court rejected defendant's claim, finding it was not credible that he had no knowledge of, or did not consent to, the filing of the civil lawsuit. The court noted that defendant had "admitted here, in open court, that he will bullshit, or B.S., anybody, essentially admitting that he will say whatever he needs to say to get what he wants .... [¶] And when I listened to that statement and evaluate [his] testimony here today, ... I cannot accept that [he] has given honest testimony, either here in court or through his declaration." The court found defendant also failed to establish prejudice: "There is no evidence that any of the jurors saw a newspaper article. They were admonished, repeatedly, throughout the trial not to view the media coverage in the case." "I am presuming, as the law does, that the jurors followed my admonitions. And, again, there is no conflict based on a lawsuit being filed in this case. So, on those grounds, the motion is denied."

(2) *Discussion*

A criminal defendant is guaranteed the right to the effective assistance of counsel, which includes the right to representation free from any conflict of interest that undermines counsel's loyalty to the defendant. (*People v. Doolin* (2009) 45 Cal.4th 390, 417.) Thus, under both the California and the federal Constitutions, "a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 168, disapproved on another ground in *People v. Doolin*, *supra*, at p. 421, fn. 22.) "[C]laims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under *Strickland* [v. *Washington* (1984) 466 U.S. 668, 694], generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different." (*People v. Doolin*, supra, at p. 417.)

The trial court's denial of a motion for a new trial based upon a claim of ineffective assistance of counsel will not be disturbed on

appeal absent " ' "a manifest and unmistakable abuse of discretion ...." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) Where, as here, the ineffective assistance claim is raised in a motion for a new trial, the Supreme Court has observed: "[T]rial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them." (*People v. Fosselman* (1983) 33 Cal.3d 572, 582–583.)

We agree with the trial court that counsel's filing of a civil lawsuit did not create a conflict of interest that rendered counsel's representation of defendant in the criminal case ineffective. Defendant claimed that counsel violated his trust and loyalty by filing the lawsuit without his knowledge or consent, but the court reasonably found the claim was not credible. There was also no evidence that counsel sacrificed defendant's interests in the criminal case for the benefit of the civil lawsuit.[4]

> 4. This case is therefore distinguishable from *People v. Corona* (1978) 80 Cal.App.3d 684, on which defendant relies. There, defense counsel rendered ineffective assistance where he purposefully engaged in conduct that harmed his client and made the trial "lengthy and sensational ... at any price," thereby "render[ing] the trial a farce and a mockery" because he had entered into a fee agreement with the defendant whereby counsel received exclusive literary rights to defendant's life story in exchange for representing him in the criminal case. (*Id.* at pp. 704, 727.) The record reflects no such fee arrangement or conflicting motivation here.

In fact, because the civil lawsuit was consistent with the defense theory, it was in counsel's interest to obtain the best verdict in the criminal case in order to achieve a good result in the civil case.

Moreover, even assuming counsel compromised his loyalty to defendant by filing the civil lawsuit, we agree with the trial court that defendant failed to establish prejudice. The court repeatedly admonished the jurors not to view media during the criminal trial, and there was no reason to believe that any juror had violated the instruction. (See *People v. Gray* (2005) 37 Cal.4th 168, 231 [jurors are presumed to follow the court's instructions].) It was also unlikely that any juror who may have seen a newspaper headline or article would have been negatively influenced by it in reaching a verdict in the criminal case, especially in light of the fact that the allegations in the civil lawsuit supported the defense theory and reflected an assertion of innocence. In light of defendant's failure to establish a conflict of interest or any prejudice stemming from a possible conflict, the court did not err in denying defendant's motion for a new trial.

*Cutrufelli*, 2019 WL 1198874 at *5–7.

The California Court of Appeal's rejection of Mr. Cutrufelli's ineffective assistance claim based on the civil suit was not contrary to, or an unreasonable application of, federal law. A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment

right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id*. A Sixth Amendment ineffectiveness of counsel violation requires, first, that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland*, 466 U.S. at 687-88, *see also Andrus v. Texas*, 140 S. Ct. 1875, 1881 (U.S. June 15, 2020) (per curiam); and, second, that there was prejudice, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Andrus*, 140 S Ct. at 1881.

One way that counsel can be ineffective is where she operates under a conflict of interest, which can be actual or potential. Where "counsel is burdened by an actual conflict of interest," a limited presumption of prejudice arises. *Strickland*, 466 U.S. at 692 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980)). Prejudice is presumed in such cases if counsel "actively represented conflicting interests" and "an actual conflict of interest adversely affected [the] lawyer's performance." *Strickland*, 466 U.S. at 692; *Sullivan*, 446 U.S. at 350, 348. The Ninth Circuit has noted that "the Supreme Court has only recognized 'actual conflicts of interest' in joint representation cases, whereby an attorney represents multiple clients with divergent interests. *Birch v. Baker*, 711 F. App'x 852, 853 (9th Cir. 2017). If counsel operates under a potential conflict of interest, a habeas petitioner must also demonstrate prejudice without the benefit of the limited presumption. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *opinion amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001) ("Without a showing of prejudice, a 'theoretical' or 'potential' conflict is insufficient to constitute actual conflict; instead, [counsel] must have actively represented conflicting interests.").

Here, Mr. Cutrufelli is not entitled to a presumption of prejudice for his Sixth Amendment claim because Mr. Troy did not represent multiple clients with divergent interests. Even if the trial court had accepted Mr. Cutrufelli's assertion that he did not authorize Mr. Troy to file the civil

12

suit,[3] the fact remains that the suit was in Mr. Cutrufelli's name and serving Mr. Cutrufelli's legal interests.  Mr. Cutrufelli did not have legally divergent interests from himself.  Mr. Cutrufelli emphasized that the criminal retainer with Mr. Troy specifically excluded civil representation; this highlights that Mr. Troy—absent a retainer or any form of written or oral agreement—would not have been entitled to any money resulting from the civil suit.  Neither Mr. Troy nor any other party represented by Mr. Troy could have sought to benefit financially from the suit.  Mr. Cutrufelli has not identified any conflicting or adverse party or motive that Mr. Troy could have been serving in filing an unauthorized civil suit.  He argues that Mr. Troy "created a conflict of interest that divided [his] loyalties between [Mr. Cutrufelli] and himself," Docket No. 1 at 15, but has not explained what Mr. Troy's own interest in filing the suit could have been.[4]  He failed to identify any interest which conflicted in any way with Mr. Cutrufelli's interests or which compromised Mr. Troy's ability and incentive to represent Mr. Cutrufelli in the criminal case.

Furthermore, in order to succeed on his ineffective assistance claim based on a potential conflict of interest, Mr. Cutrufelli would need to demonstrate that trial counsel's potential conflict of interest caused him to conduct himself in an objectively unreasonable manner related to the civil lawsuit, and that his doing so that resulted in prejudice.

Here, Mr. Cutrufelli suggests that Mr. Troy violated professional norms when he conducted an interview about the civil lawsuit with the Independent Journal that "was motivated by financial gain as well as personal notoriety."  Docket No. 1 at 17-18.  Mr. Cutrufelli invokes California Rules of Professional Conduct, Rule 5-120.  *Id.*  The rule reads, in relevant part:

---

[3] One of the news articles about the civil suit described it as having been "filed on [Mr. Cutrufelli's] behalf by his father and his criminal defense attorney."  Docket No. 11-2 at 334.

[4] Mr. Cutrufelli claims that Mr. Troy's motive of financial gain and personal notoriety "may be inferred from his low fee of $20,000 to represent [Mr. Cutrufelli] at trial."  Docket No. 1 at 18 n.20.  This is highly speculative, and Mr. Cutrufelli has not explained how Mr. Troy could have expected to gain any revenue from a civil suit that he never discussed with the client, nor why "notoriety" would be something an attorney would deliberately pursue at the cost of losing a case.  Appellate counsel analogized his case to situations where clients trade literacy rights for their defense, *see* Docket No. 1 at 15-17, but there is no evidence that that occurred here.  Even Mr. Cutrufelli himself did not make that claim in his declaration in support of the motion for a new trial.  Trial counsel would certainly have benefitted more from winning Mr. Cutrufelli's case than intentionally sabotaging it.

United States District Court
Northern District of California

> (A) A member who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the member knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.
> . . . .
> (C) Notwithstanding paragraph (A), a member may make a statement that a reasonable member would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the member or the member's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

Mr. Cutrufelli claims that Mr. Troy's conduct "open[ed] [him] up . . . to . . . ridicule and negation of his defense" in the form of negative publicity and social media commentary regarding the civil suit, thereby depriving him of effective assistance of counsel.

But, as the trial court and California Court of Appeal noted, Mr. Troy's statements in the news article were consistent with the defense theory argued at trial. His media statements could have been appropriate as damage control under subsection (C) of the cited professional conduct rule. Even if Mr. Troy filed the civil suit on his own, he could have done so intending it to bolster Mr. Cutrufelli's criminal case. The fact that it backfired does not render it ineffective assistance of counsel. Trial counsel have "wide latitude . . . in making tactical decisions" and "[b]eyond the general requirement of reasonableness, specific guidelines are not appropriate." *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (internal quotation marks omitted). *See also Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (no ineffective assistance where trial strategy was "incorrect" "[w]ith the benefit of hindsight"). Mr. Troy's tactics may have been unusual, but not so unreasonable or so deficient as to fail the "doubl[e]" deference owed in the *Strickland* and AEDPA context to both counsel's choices and the state courts' interpretation of them. *See Pinholster*, 563 U.S. at 200-202. In addition, the fact that Mr. Troy filed a motion for a change of venue because of the extent of pretrial publicity suggests that Mr. Troy both was aware of the potential impacts of negative publicity on Mr. Cutrufelli's case, and attempted to mitigate the potential harm. *See* Docket No. 11-1 at 1099, 1101 (arguing that the publicity was prejudicial in part because "[a] 'home invasion' in broad daylight is entirely different from the defense's theory of the case and is not supported by the evidence in the case.").

14

United States District Court
Northern District of California

A habeas petitioner bears the burden of rebutting the strong presumption that strategic decisions by counsel are reasonable, and the absence of evidence cannot overcome the presumption. *Dunn v. Reeves*, 145 S. Ct. 2405, 2410 (2021) (per curiam) (internal quotations omitted). Mr. Cutrufelli has not rebutted the presumption that Mr. Troy's actions related to the civil lawsuit were reasonable tactical choices for the criminal case,[5] *see Dunn*, 145 S. Ct. at 2410, and the state appellate court's determination that counsel was not ineffective on the basis of conflict was reasonable.

Moreover, the California Court of Appeal's finding that there was no prejudice was reasonable. The trial court instructed the jury not to view media during the trial, and the articles, even if the jury had viewed them, were generally consistent with the defense theory.[6] *See* Docket No. 11-2 at 328-338. Additionally, the evidence against Mr. Cutrufelli was strong enough that the jury would have convicted him even without any negative feeling they might have formed about him for having filed a concurrent negligence suit against the victim.

Because the state appellate court's finding that Mr. Troy was not ineffective and there was no prejudice was not an unreasonable application of law or based on an unreasonable finding of fact. Habeas relief is not available for this claim.

B. <u>Ineffective Assistance: Trial Counsel's Failure to Adequately Impeach Jay Leone</u>

Mr. Cutrufelli argues that he was "deprived effective assistance of counsel due to counsel's failure to fully impeach Jay Leone." Docket No. 1 at 5. During the motion for a new trial, Ms. Boyle argued that Mr. Troy was ineffective in failing to impeach the victim Jay Leone "with various of his inconsistent statements concerning the incident and with the testimony of an expert . . . a geriatric psychiatrist . . . who could have explained how some of his medical conditions

---

[5] The California Court of Appeal found that there was no conflict, nor any prejudice, and did not make a factual finding as to whether Mr. Troy's actions related to the civil lawsuit were tactical. It did find that the trial court's finding—that Mr. Cutrufelli's claim that the civil lawsuit was unauthorized was not credible was—reasonable. The trial court's finding that the lawsuit was not unauthorized is entitled to a presumption of correctness under 28 U.S.C. section 2254(e)(1), which can only be rebutted by clear and convincing evidence.

[6] For example, one article reported that "Troy, the defense attorney, has argued that Cutrufelli was a methamphetamine user, that the incident was a botched drug deal with someone else in the home, and that Leone shot him in the back when he was trying to flee." Docket No. 11-2 at 329.

could have impacted his memory and recall." Docket No. 1 at 22. The trial court denied the

motion. *Id.*; Docket No. 11-5 at 670-72.

The California Court of Appeal rejected Mr. Cutrufelli's claim that the trial court erred:

> Defendant contends the trial court should have granted his motion
> for a new trial based on trial counsel's failure to fully cross-examine
> J.L. and his failure to present an expert witness to "explain[ ] how
> some of [J.L.'s] medical conditions could have impacted his
> memory ...." We reject his contention.
>
> After the verdict, defendant retained new counsel, who argued that
> trial counsel had not provided adequate representation. The trial
> court rejected the argument, stating: "[New counsel] is claiming that
> [prior counsel] didn't try the case to the level of her standards,
> therefore, he is incompetent. That is not the Constitutional standard.
> [Prior counsel] provided the Constitutionally adequate
> representation to [defendant] in a tough case." The court noted,
> among other things, that trial counsel conducted an investigation,
> requested funds for—and consulted with—experts, offered a
> consistent defense theory, and competently represented defendant at
> trial with an "aggressive and forceful and focused" "courtroom
> approach," which "the Court appreciate[d] and admired ...."
>
> The trial court said as to counsel's alleged failure to fully cross-
> examine J.L. or to retain an expert on memory issues: "My own
> observations of [J.L.'s] testimony supported by notes I took
> throughout the trial, [were] that he was an awfully good, powerful,
> persuasive prosecution witness, who it might well have done the
> defense attorney good to not keep on the stand for too long. He was
> an attractive witness, an engaging witness, a sympathetic witness, a
> witness who had a memory of what happened and whose recitation
> of what happened was completely consistent with all the
> corroborating evidence that was presented throughout the trial. [¶] I
> am not sure a defense attorney would want that witness on the stand
> for very long. And impeaching him with minor inconsistencies of
> various statements that may have been made, from this Court's
> perspective, would have had no effect."
>
> The trial court also found defendant had failed to show prejudice:
> "Nothing ... that has been mentioned here would have impacted the
> jury's verdict in this case, even had it been presented in a different
> fashion, as [new counsel] suggests it should have been presented.
> There just is simply no reasonable probability but for by ineffective
> assistance of counsel that the results in this case would have been
> different. [¶] There is no question, from my perspective, that with ...
> approximately 20 years of experience in the criminal justice system,
> presiding over criminal matters and having worked as both a
> prosecutor and a defense attorney ..., that this case was the strongest
> prosecution case that I have ever been involved in. The evidence of
> [defendant's] guilt is simply overwhelming, and I cannot see how
> any ineffective assistance of counsel, if it occurred, would have
> prejudiced the defendant."

United States District Court
Northern District of California

16

We agree that defendant failed to show that his counsel's performance was deficient, or that there was a reasonable probability the result would have been different absent any deficient performance. . . .

Reviewing "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) Where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, courts will not find ineffective assistance of counsel on appeal unless there could be " ' "no conceivable tactical purpose" ' " for counsel's acts or omissions. (*People v. Earp* (1999) 20 Cal.4th 826, 896; *People v. Fosselman*, *supra*, 33 Cal.3d at p. 581.) In particular, a trial counsel's manner of cross-examination is a matter within his or her discretion and rarely implicates ineffective assistance of counsel. (*People v. McDermott* (2002) 28 Cal.4th 946, 993.)

Here, the record shows that trial counsel thoroughly and competently cross-examined J.L. to discredit his testimony, including eliciting testimony suggesting J.L. spent some time covering something up because there was a 22-minute gap between the time defendant left the house and the time J.L. went outside to greet police. Counsel also asked—and J.L. could not answer—why there was an unspent bullet in the .38-caliber revolver even though J.L. had testified the gun was empty when defendant pointed it at J.L.'s head and pulled the trigger. Counsel also impeached J.L. with prior inconsistent statements, including the fact that he had previously said he " 'started shooting' " at defendant " '[a]s soon as I saw him[.]' "

Further, as the trial court noted, J.L. was a sympathetic witness, and an attractive witness for the prosecution. He was 90 years old at the time he was violently robbed and attacked in his own home. He convincingly described in detail how defendant broke in, pointed a gun at him, tied him up, ransacked his home, then shot him in the face, tackled him, wrested away his gun, and tried to kill him. He answered many difficult questions appropriately during cross-examination. Defendant argues that counsel should have asked J.L. about additional prior inconsistent statements, including whether the struggle took place on the floor or on the bed, whether J.L. pointed the gun at defendant or kept it at his side until after defendant fired, and whether defendant was standing over J.L. or lying on top of him when he pulled the trigger. In light of J.L.'s powerful, persuasive, and sympathetic testimony, counsel could have reasonably determined that further cross-examination on these additional points would not have served defendant's interests.

We also reject defendant's claim that trial counsel rendered ineffective assistance by failing to present expert testimony regarding J.L.'s potential memory issues. Defendant asserts, as he did below, that counsel should have presented the testimony of an expert who questioned J.L.'s ability to recall the incident accurately because J.L. "had periods of severe confusion while hospitalized

United States District Court
Northern District of California

following the incident" and suffered complications " 'that increased [his] challenges in accurately recalling the events ....' " As the trial court noted, however, J.L. had a good memory of the incident and his testimony was "completely consistent with all the corroborating evidence that was presented throughout the trial." In light of this, counsel could have reasonably determined that presenting the testimony of an expert witness who had never spoken with or examined J.L. would not be helpful to defendant's case. Counsel could have also reasonably determined that jurors could become even more sympathetic towards J.L. if they heard testimony about how his brain functioning suffered as a result of being shot in the face or head by defendant.

Generally, counsel's decision to call particular witnesses is "precisely the type of choice which should not be subject to review by an appellate court." (*People v. Floyd* (1970) 1 Cal.3d 694, 709, overruled on another ground in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.) As long as trial counsel has adequately investigated what a witness will say, courts rarely conclude that counsel's tactical decision not to call a witness amounts to ineffective assistance, because counsel cannot be faulted for deciding not to call a witness whose testimony might do more harm than good. (*People v. Miranda* (1987) 44 Cal.3d 57, 121, overruled on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) Counsel did not perform deficiently in making the reasonable tactical decision not to present expert testimony regarding J.L.'s memory.[5]

> 5. Defendant also asserts counsel failed to conduct an adequate investigation of the potential expert testimony. The record, however, suggests that counsel investigated the issue and simply decided against presenting the testimony. Counsel stated, for example, in a declaration he filed in support of a request for a continuance, that he needed additional time to develop expert testimony on the subject of "dementia and age-related mental states ...."

The trial court also properly found defendant failed to show prejudice. Evidence of defendant's guilt was extremely strong; the court stated that in its 20 years of experience, this was "the strongest prosecution case that I have ever been involved in." J.L. testified in detail about the incident, and video surveillance showed a black Lexus with the same front-end damage as defendant's Lexus going in and out of J.L.'s driveway. A man was seen walking near J.L.'s house wearing clothing that matched what defendant was wearing that day, and the man's shoes matched the shoes recovered from defendant's Lexus. Defendant was shot by J.L. in J.L.'s home, and J.L.'s gun was recovered from defendant's Lexus about a quarter-mile away. The front door to J.L.'s house was kicked in, the drawers in the master bedroom were open, and the closet was ransacked, strongly suggesting a burglary. The police recovered property taken from J.L.'s house and T.C.'s house in defendant's car. Defendant's DNA was found on the firearms, on the bedroom closet floor, and on J.L.'s bedspread. In light of J.L.'s coherent and persuasive testimony and the overwhelming evidence of defendant's guilt, there is no reasonable probability the result would have been different if

1  counsel had cross-examined J.L. on additional inconsistent
2  statements, or if he had presented expert testimony on J.L.'s
   potential memory issues.

3  *Cutrufelli*, 2019 WL 1198874 at *7–9.

4  The California Court of Appeal's rejection of Mr. Cutrufelli's ineffective assistance claim

5  based on trial counsel's impeachment of Jay Leone was not contrary to, or an unreasonable

6  application of, federal law.

7      1.    <u>Inconsistent Statements</u>

8  Specifically, Mr. Cutrufelli identifies the following inconsistent statements that trial

9  counsel failed to impeach:

10      1) where Mr. Leone was when he first encountered Mr. Cutrufelli
11  (he placed himself in various locations, from the bedroom to the
    hallway close to the front door), 2) where the struggle between
12  himself and Mr. Cutrufelli took place (Mr. Leone said at times that
    this struggle occurred on the floor and at other times stated that it
13  occurred on the bed rather than the floor), 3) whether the two went
    to the garage together at all, 4) whether Mr. Leone held his gun and
14  pointed it at Mr. Cutrufelli when he came out of the bathroom or
    kept the weapon at his side until after Mr. Cutrufelli had fired, and
15  5) whether Mr. Cutrufelli was standing over him or lying on top of
    him when he supposedly pointed the empty .38 at Mr. Leone's head
16  and pulled the trigger.

17  Docket No. 1 at 28.

18  The California Court of Appeal's finding that defense counsel's failure to cross-examine

19  Mr. Leone as to these particular inconsistencies was not ineffective assistance was reasonable.

20  "[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular

21  witness or from asking a particular line of questions, are given great deference and must . . . meet

22  only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000).

23  Effective assistance does not require impeaching a witness with every single inconsistent

24  statement.  The state appellate court noted that trial counsel cross-examined Mr. Leone about the

25  22 minutes between when Mr. Cutrufelli left his house and when Mr. Leone went outside to speak

26  with the police, the unspent bullet in the .38, and when he started shooting at Mr. Cutrufelli.

27  Contrary to Mr. Cutrufelli's assertion, this is not a case where trial counsel "fail[ed] to impeach <u>at</u>

28  <u>all</u> with inconsistencies the only witness on whose testimony conviction rests."  Docket No. 1 at

United States District Court
Northern District of California

19

30.  It is, instead, a case where "counsel impeach[ed] the witness with important inconsistencies" and "made a reasonable effort to defend the client," which Mr. Cutrufelli acknowledges is adequate.  *See id.*  Habeas relief is not available based on the extent of trial counsel's cross-examination of Mr. Leone.[7]

### 2.   Failure to Call a Memory Expert

Nor was failure to call a memory expert ineffective assistance.  The failure to call an expert does not amount to ineffective assistance of counsel where it is not warranted by the evidence.  *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (a decision not to pursue testimony by a psychiatric expert is not unreasonable when the evidence does not raise the possibility of a strong mental state defense).  The Ninth Circuit has determined that failure to call an expert witness on the unreliability of eyewitness identification does not constitute ineffective assistance because "skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable," which precludes a finding of prejudice under *Strickland*.  *Howard v. Clark*, 608 F.3d at 563, 574 (9th Cir. 2010).

Here, similarly, trial counsel cross-examined Mr. Leone about several inconsistencies in his testimony.  The jury was aware of Mr. Leone's advanced age, and would have been aware as a matter of common sense that his memory might not have been perfect.  Mr. Cutrufelli's case is unlike the (out-of-circuit) cases he cites involving defense counsel failures to call rebuttal experts regarding Child Sexual Abuse Accommodation Syndrome, which is a type of expert testimony that significantly bolsters the credibility of complaining witnesses in cases that are often exclusively dependent on victim and perpetrator testimony.  *See* Docket No. 1 at 40-42.  Here, the prosecution did not present expert testimony to bolster Mr. Leone's credibility, and there was extensive physical and other evidence in the case.  There was no failure to bring an expert

---

[7] This case is unlike *United States v. Tucker*, 716 F.2d 576, 585 (9th Cir. 1983), which Mr. Cutrufelli cites, where defense counsel "did not attempt to impeach" a key government witness "with a single prior inconsistent statement" or attempt to impeach "any other witness."  *See* Docket No. 1 at 31.  Mr. Troy did attempt to impeach Mr. Leone, but not exactly in the manner or to the extent which Mr. Cutrufelli claims was necessary.

United States District Court
Northern District of California

regarding critical disputed or potentially exonerating physical or forensic evidence as in *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008).  Nor was there a failure to bring an expert regarding the validity of a confession as in *Lunbery v. Hornbeak*, 605 F.3d 754, 760 (9th Cir. 2010).  *See* Docket No. 1 at 42-43.  Here, Mr. Leone's age and the injuries he suffered were evident and the possible effect on his memory is something jurors could assess without expert evidence.

Mr. Cutrufelli argues that trial counsel's choice not to call a memory expert "cannot be justified as a reasonable tactical choice because it was made without benefit of a proper investigation."  Docket No. 1 at 44.  The California Court of Appeal noted that the record demonstrated that trial counsel had investigated the potential expert testimony.  In an August 30, 2012 motion for a continuance, Mr. Troy declared that defense counsel had retained memory expert Stephen Read and needed additional time for him to prepare a report after receiving voluminous medical records of Mr. Leone's.  Docket No. 11-1 at 1073.  He stated that Mr. Read "evidences that he will be available to testify for the defense at trial should it be continued until mid-November."  *Id.* at 1073-74.  Mr. Troy also filed a request for funding from the court for Mr. Read, as well as for a ballistics expert and a DNA expert.  *Id.* at 1109-12.

Mr. Read, who had first been contacted by Mr. Cutrufelli's public defender Ms. Boyle, later submitted a declaration in support of Ms. Boyle's motion for a new trial stating that he had been contacted by Mr. Troy in late August 2012 about working on Mr. Cutrufelli's case, but had informed Mr. Troy that "due to [his] schedule [he] was not able to assist them due to the short notice they had provided."  Docket No. 11-2 at 379.  He noted that he was not retained until after trial when Ms. Boyle retained him in connection with the motion for a new trial.  *Id.*

The trial court denied Mr. Troy's August 30th motion for a continuance, noting that Mr. Toy's declaration was insufficiently specific and did not establish good cause.  Docket No. 11-1 at 1213.  It also indicated that it would provide funding for experts if Mr. Troy demonstrated that Mr. Cutrufelli was indeed indigent.  Docket No. 11-3 at 536-38.  Mr. Troy then stated that he and the prosecutor had "sort of worked out the medical stuff."  *Id.* at 538.  He explained:

> I had to hire a paralegal to look through a medical specialist. As you said, it's a banker's box. It took them a week to look through it. They boiled it down to the essentials.  Then [the prosecutor] and I

United States District Court
Northern District of California

> went over it. There's some indication of dementia . . . but it's—if I need an expert, it's—as [the prosecutor] said, her part of the case will take three weeks with the jury—a month's time on the medical stuff should be enough . . . That amount of time would be enough to prepare, if I need a psychiatrist or something like that, to testify about dementia.
>
> It's a collateral issue, at this point. It's not a raging issue that he can't remember anything. So it's tangential, at this point, but it's a possibility.  But I don't think—I'm not asking to continue the case based on that aspect of it because [the prosecutor] pointed out we have a month before the doctor would have to testify, if we get that doctor.

*Id.* at 538-39.  It is clear from this exchange that Mr. Troy was aware of and investigated the

possibility that Mr. Leone may have had memory issues, and that the subsequent decision he made

not to call a memory expert was a tactical one.

Further, the state appellate court's finding that there was no prejudice was not

unreasonable.  Mr. Read's declaration in support of the new trial motion stated that Mr. Leone had

not previously been diagnosed with dementia, but since the incident had experienced

complications potentially impacting his recall including insufficient blood flow to the brain;

periods of "severe confusion" at the hospital; breathing difficulties; anxiety and agitation;

"sundowning," which suggested preexisting brain damage; the administration of anti-psychotic

medications to calm him, and severe and prolonged delirium.  Docket No. 11-2 at 379-81.  He

concluded:

> Mr. Leone's independent formulation of his recall of the events of 1/4/12 is not only challenged by the disruptions of brain function that occurred during the post injury hospitalization, but also because of the series of interviews with the police and concerned others that occurred in the days following the event, including specifically police, his sister, son, and hospital personnel. As per the above, Mr. Leone's brain function was far from optimal over much of this time, complicating his ability accurately to integrate information he may have learned and to distinguish his actual memories. Questions, responses, other information provided during those discussions have all been shown to have an active role in the <u>evolution</u> of a person's memory of an event.

*Id.* at 381-82.

The admission of this information at trial would not have had a "substantial and injurious

effect or influence" on the verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  As the

22

state appellate court reasonably found, the evidence against Mr. Cutrufelli was strong, including not only Mr. Leone's testimony but also physical evidence at the scene, video surveillance connecting Mr. Cutrufelli's car to the scene, eyewitness testimony connecting the clothing and shoes Mr. Cutrufelli wore the day of the incident to the scene, the fact that Mr. Cutrufelli was shot by Mr. Leone during the incident, and the recovery of Mr. Leone's gun and some of his other property in Mr. Cutrufelli's car.  Expert testimony calling Mr. Leone's memory into question— based primarily on factors related to his understandably high stress and anxiety levels at the hospital immediately after the incident—would not have undermined the impact of his testimony matching the other trial evidence closely enough to persuade the jury.

Because the state appellate court's finding that Mr. Troy was not ineffective with respect to impeachment of Mr. Leone and that there was no prejudice, was not an unreasonable application of law or based on an unreasonable finding of fact, habeas relief is not available for this claim.

C.    Mr. Cutrufelli's Right to Testify

Mr. Cutrufelli argues that he was deprived of his right to testify on his own behalf, in violation of the Fifth, Sixth, and Fourteenth Amendments.  Docket No. 1 at 5.  On July 31, 2012, the trial court held a hearing on Ms. Boyle's motion to continue the trial, based on documents she requested to file under seal, dealing with the timeline for developing expert testimony.  Docket No. 11-3 at 391, *see* Docket No. 11-1 at 773 (declaration in support of motion).  Mr. Troy also appeared at the same hearing and stated he had been retained by Mr. Cutrufelli's father.  Docket No. 11-3 at 391.  The prosecutor objected to Mr. Troy substituting as Mr. Cutrufelli's counsel and objected to the continuance.  *Id.* at 392-93.  Mr. Troy indicated that he was not prepared to go to trial the following Monday.  *Id.* at 394.  He indicated that he would request a hearing pursuant to *People v. Marsden*, 2 Cal.3d 118 (1970), if the court denied the substitution of counsel.  *Id.*  The trial court said, "That request is denied."  *Id.*  Mr. Troy stated he would be ready for trial in six months.  *Id.*  He stated that he would file a writ to obtain a *Marsden* hearing if he were not allowed to substitute as Mr. Cutrufelli's counsel.  *Id.* at 401-02.  Then he revised his estimate and indicated he could be ready in three months.  *Id.* at 405.

The trial court denied Mr. Cutrufelli's request to substitute Mr. Troy as counsel, based in

United States District Court
Northern District of California

part on his delay in bringing the motion until the last minute, the age of the victim, and the court's concern that Mr. Troy would request additional continuances. *Id.* at 416. The court then asked Mr. Cutrufelli if he wished to have a *Marsden* hearing. *Id.* at 417. Mr. Cutrufelli stated that he did, and the court set it for the next day. *Id.* Mr. Troy asked to represent Mr. Cutrufelli at the *Marsden* hearing, which the court denied. *Id.* at 418-19. The next day, Mr. Troy again requested to be present for the *Marsden* hearing, which the court again denied. *Id.* at 425-26. The *Marsden* hearing was held on August 1 without Mr. Troy.[8]  *See* Docket No. 11-1 at 995-96. The trial court denied the motion, Docket No. 11-3 at 426, but continued the trial to September 18, 2012, *id.* at 448, giving Mr. Troy, whom the court ultimately allowed to substitute as Mr. Cutrufelli's counsel one week later on August 8, *see id.* at 470, six more weeks to prepare.

During a September 13 pretrial hearing, Mr. Troy informed the court that Mr. Cutrufelli intended to admit to being a felon in possession such that it would not need to come before the jury, noting, "[h]e's not testifying." Docket No. 11-3 at 576-77. Subsequently, the court offered to "voir dire on the defendant not testifying," which Mr. Troy agreed "would be good." *Id.* at 633. During his opening, he noted, "my client may or may not testify. It's up to us to decide." Docket No. 11-4 at 90. Mr. Troy did not call Mr. Cutrufelli as a witness. *See* Docket No. 11-2 at 43-49, 66-68.

After his trial, Mr. Cutrufelli discharged Mr. Troy and requested that the public defender, Ms. Boyle, be appointed to represent him at his sentencing hearing. Docket No. 11-5 at 486-88. On November 15, 2012, Ms. Boyle indicated that she wanted to review the trial transcripts before sentencing, and that the court reporter had some limitations on her availability to create the transcripts. *Id.* at 491. On December 5, 2012, Ms. Boyle indicated that she had not ordered the transcripts because she "wanted to make sure exactly what portions of the transcript were needed." *Id.* at 500-01. She indicated that she would need time to review the transcripts. *Id.* at 502. The trial court therefore set sentencing for March 7, 2013. *Id.* at 506. As of February 8, 2013, the

---

[8]  *See, e.g.*, *People v. Zamora*, No. E057915, 2014 WL 3737955, at *1 n.2 (Cal. Ct. App. July 30, 2014) ("A so-called *Marsden* hearing is typically conducted outside the presence of the public, the jury, and the prosecution and allows the defendant an opportunity to convey to the court reasons he should be appointed new counsel. (*People v. Lopez* (2008) 168 Cal.App.4th 801, 814–815.)").

transcripts were "about finished." *Id.* at 518. On February 21, 2013, the trial court heard Ms.

Boyle's request for a transcript of the *Marsden* hearing. *Id.* at 537. Ms. Boyle noted the transcript

would "contain, as I recall, and as Mr. Cutrufelli also recalls, statements of Mr. Cutrufelli that I

believe will be relevant to the new trial motion." *Id.* at 540. Ms. Boyle subsequently requested an

additional two-month continuance of the sentencing hearing, indicating that she was still working

on the new trial motion, and the court moved the sentencing to April 4th. *Id.* at 569, 576, 583.

Mr. Cutrufelli argued in his motion for a new trial that he had told Mr. Troy that he wanted

to testify, and that Mr. Troy's failing to call him violated his right to testify and constituted

ineffective assistance. Docket No. 11-2 at 285. Ms. Boyle argued that "Mr. Cutrufelli's

declaration that he wanted to testify and had always intended to testify is completely supported by

the transcript of the *Marsden* . . . in which Mr. Cutrufelli states, in no uncertain terms, that he

wanted to testify. I think he explained well the circumstances of what had gone on at the trial."[9]

Docket No. 11-5 at 649. The trial court denied the motion, finding that Mr. Cutrufelli was not

credible, including because he waited five months to bring the motion.[10]   Docket No. 11-5 at 671-

---

[9] Ms. Boyle also stated that she filed the *Marsden* transcript. Docket No. 11-5 at 649. However, the Clerk's Transcript shows that Ms. Boyle's declaration in support of the new trial motion was accompanied by Exhibits A-J, none of which constituted the *Marsden* transcript. *See* Docket No. 11-2 at 283-397. Ms. Boyle then filed a supplemental declaration in support of the new trial motion, with Exhibits A-D, none of which constituted the *Marsden* transcript. *Id.* at 570-586.

[10] Part of the reason for the five months between the verdict (October 31, 2012, *see* Docket No. 11-2 at 146) and new trial motion (March 22, 2013, *see* Docket No. 11-2 at 305) was the transition back from Mr. Troy to Ms. Boyle, and that Ms. Boyle needed to obtain and review the trial transcripts and *Marsden* transcript, as well as investigate other possible ineffective assistance issues to raise in the motion. Mr. Cutrufelli attempted to speak with Ms. Boyle about his concerns about the trial soon after the verdict, but was unable to do so until Mr. Troy was discharged on November 13, 2012. He stated on November 6, 2012:

> I want to talk to Kathleen Boyle. They won't let me talk to her.
> . . . .
> I need to talk to her about a few things. I need to talk to another
> lawyer or somebody.
> . . .
> How do I talk to her? There's questions like . . . funding that you
> gave. Did you agree to give funding or not give funding for this?
> You said at the end of the trial that you gave money—that I am not
> indigent, that you gave me money to do experts, but we didn't get
> any experts. So where did the money go if we didn't get any
> experts?
> . . .

United States District Court
Northern District of California

72. On appeal, Mr. Cutrufelli argued that the trial court erred in denying the new trial motion. Docket No. 1 at 45. He claimed that the court was aware from the *Marsden* hearing that he wanted to testify: "the failure of his then trial counsel, Ms. Boyle, to prepare him for his upcoming testimony, was one of his chief complaints against her." *Id.* at 49. He argued that he had no further opportunity after the Marsden hearing to remind the trial court that he wished to testify. *Id.*

The California Court of Appeal rejected the claim:

> Defendant contends he was deprived of his right to testify and the effective assistance of counsel because he was not allowed to take the stand. We reject his contention.
>
> A defendant who wishes to testify may not be deprived of doing so even if counsel objects as long as the defendant timely and adequately asserts the right to testify. (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231.) "Without such an assertion, '... a trial judge may safely assume that a defendant who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy.'" (*Ibid.*) "When the record fails to show such a demand, a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to his counsel his desire to testify, he was deprived of that opportunity." (*Id.* at pp. 1231–1232.) "Absent [a] timely assertion of his desire to testify, [a defendant] is bound by his counsel's decision and must seek relief, if any is due, by showing ineffective assistance of counsel." (*Id.* at p. 1232.)
>
> Here, defendant claimed in a motion for a new trial that his trial counsel "violated his fundamental right" by not allowing him to testify. Defendant stated he told counsel he wanted to testify and was "stunned" when he was not called to the stand. The trial court rejected the claim, stating defendant was not credible: "I do not accept [defendant's] representation in the declaration that he wanted to testify or that he told [trial counsel] that he wanted to testify. The facts support that just the opposite happened in that he is now making the claim at this late date. [¶] At no point before his declaration is filed, some five months after the verdict, did [defendant] ever indicate that he was being denied an opportunity to testify, that he wanted to testify, and the Court finds that to be compelling corroborative information to support my conclusion that

---

I didn't want to not waive time. I just wanted to talk to my old lawyer, and they won't talk to me while I have this lawyer. I don't mind waiving sentencing. That's not what I was asking ever is to not waive time. What I was talking about was talking to Ms. Boyle. They won't talk to me until they have me at the Public Defender's Office.

Docket No. 11-5 at 465-66, 469.

[he] is not being truthful in his declaration."

Defendant asserts on appeal that he made his intent to testify clear when he told his prior counsel of his wish to testify during a *Marsden* hearing, but there was no evidence—other than his declaration, which the court found not credible—that he told his *trial* counsel that he wanted to testify. Instead, the record shows that defendant sat silent when counsel informed the court that his client would not be testifying. He also did not say anything when counsel stated during voir dire that defendant was not going to take the stand. Defendant's failure to protest to the court at those times, or at any time during the trial, or for five months after the trial, belied his claim and supported the court's finding that defendant did not make a "timely assertion of his desire to testify ...." (*People v. Hayes*, supra, 229 Cal.App.3d at p. 1232 [in the absence of a timely assertion, a defendant must seek relief by showing ineffective assistance of counsel]; *People v. Dickens* (2005) 130 Cal.App.4th 1245, 1252 [a trial court's factual findings will be upheld if supported by substantial evidence].)

We also conclude counsel did not render ineffective assistance by not calling defendant to the stand. Defendant's prior use of a weapon in conjunction with his prior conviction for assault with a deadly weapon would have provided a basis for questioning about the prior conviction. The prosecution would have also been able to cross-examine defendant regarding the stolen property that was recovered from his Lexus. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin*, supra, 18 Cal.4th at p. 333; *People v. Earp*, supra, 20 Cal.4th at p. 896 [even where counsel's strategic reasons for decisions do not appear on the record, courts will not find ineffective assistance unless there could be " ' "no conceivable tactical purpose" ' " for counsel's acts].) Because there were legitimate reasons not to present defendant's testimony to the jury, we will not second-guess counsel's tactical decision not to call defendant to the stand. (*People v. Scott*, supra, 15 Cal.4th at p. 1212 [reviewing courts do not second-guess reasonable tactical decisions "in the harsh light of hindsight"].)

*Cutrufelli*, 2019 WL 1198874 at *9–10.

The right to testify in one's own defense "is well established, and is a 'constitutional right of fundamental dimension.'" *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999) (quoting *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.1993)). The right may be relinquished only by the defendant, and the defendant's relinquishment of the right must be knowing and intentional. *See Joelson*, 7 F.3d at 177 (9th Cir. 1993). Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify. *Id.* A trial court has no duty to advise a defendant of his right to testify, nor is the court required to ensure that an on-the-record waiver has occurred. *United States v. Edwards*,

897 F.2d 445, 446 (9th Cir.), *cert. denied*, 498 U.S. 1000 (1990).  Waiver of the right may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so.  *See Joelson*, 7 F.3d at 177; *Edwards*, 897 F.2d at 446.  A defendant who wants to reject his attorney's advice and take the stand may do so by insisting on testifying, speaking to the court or discharging his lawyer.  *See Joelson*, 7 F.3d at 177.  A defendant waives the right to testify if he remains silent in the face of his attorney's decision not to call him as a witness.  *See Pino-Noriega*, 189 F.3d 1089 at 1094-95; *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993).

Here, the trial court found that Mr. Cutrufelli's assertion that he told his attorney he wished to testify was not credible.  The California Court of Appeal noted there was no other evidence that Mr. Cutrufelli informed trial counsel, or the court, that he wished to testify.  Mr. Cutrufelli did discharge his lawyer after trial, but he did not speak to the trial court at any time after the pretrial *Marsden* hearing about wishing to testify.  Nor did he indicate that his reason for discharging his attorney had to do with the fact that he was not called to testify—he mentioned to the court only the lack of experts at trial.  Absent any evidence in the record that Mr. Cutrufelli actually attempted to exercise his right to testify, other than his own assertion, the trial court's factual finding that Mr. Cutrufelli did not seek to testify and its affirmance by the appellate court along with its conclusion that Mr. Cutrufelli was not denied the right to testify was reasonable.  *See Serpa v. Borg*, 967 F.2d 590 (9th Cir. 1992) (affirming denial of habeas petition where petitioner did not testify nor notify the trial court that he wished to testify); *Kittson v. Zenon*, 42 F.3d 1400 (9th Cir. 1994) (same); *cf. United States v. Gillenwater*, 717 F.3d 1070, 1081 (9th Cir. 2013) (defendant did not waive his right to testify through silent acquiescence to his counsel's decision where defendant clearly indicated during hearing that he wished to testify).

The California Court of Appeal's finding that Mr. Cutrufelli's trial counsel was not ineffective by failing to call him as a witness was also reasonable.  It is true that although the state appellate court noted that Mr. Cutrufelli could have been questioned about his prior conviction if he testified, the trial court had held before trial that, if Mr. Cutrufelli were to testify, it would sanitize his prior assault with a deadly weapon conviction so that the jury could only hear that he

United States District Court
Northern District of California

had been convicted of a crime of moral turpitude.  Docket No. 11-3 at 665-67.  It is also true that the trial court had also denied the prosecutor's motion to impeach Mr. Cutrufelli with testimony from a Ms. Hildebrand, who believed that Mr. Cutrufelli had stolen from her in an uncharged crime.  *Id.* at 681-82; Docket No. 11-4 at 20-21.  However, as the state appellate court noted, Mr. Cutrufelli could have been cross-examined about the stolen property that was found in his car.  Although the stolen property was discussed at trial—*see*, *e.g.*, Docket No. 11-4 at 68 (prosecutor's opening), *id.* at 89 (defense's opening, arguing that the property was not stolen)—it is possible that direct examination on the matter could have been even more harmful to Mr. Cutrufelli.  In light of the potential impeachment and the trial court's finding that Mr. Cutrufelli was not credible, trial counsel's decision not to call him did not fall below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  Because the state appellate court's finding that Mr. Cutrufelli was not denied the right to testify was not an unreasonable application of law or based on an unreasonable finding of fact, habeas relief is not available for this claim.

D.    Motion to Unseal Juror Contact Information

Mr. Cutrufelli argues that he was deprived the Sixth and Fourteenth Amendment right to a fair and impartial jury because the trial court denied his motion to unseal juror contact information.  Docket No. 1 at 6.

The California Court of Appeal rejected this claim:

> Defendant contends the trial court erred by failing to release juror information. We reject his contention.
>
> Trial counsel sought the release of sealed juror information so that the defense could investigate whether any jurors had engaged in misconduct in connection with the publicity that defendant's civil lawsuit against J.L. received. The prosecutor argued it was "speculative" whether any misconduct occurred and that the privacy of jurors should not be "invaded on a serious case such as this merely for a fishing expedition." The prosecutor noted the trial court had admonished the jurors almost daily during trial to avoid looking at media coverage, and it was presumed they followed the admonitions. The court denied the motion, finding defendant had failed to establish a prima facie showing of good cause because "the showing made here is speculative at best ...."
>
> Once the jury's verdict is recorded, the trial court's record of

1   personal identifying information of individual jurors must be sealed
2   until ordered otherwise. (Code Civ. Proc., § 237, subd. (a).) The
    defense may "petition the court for access to personal juror
3   identifying information within the court's records necessary for the
    defendant to communicate with jurors for the purpose of developing
4   a motion for new trial or any other lawful purpose." (Code Civ.
    Proc., § 206, subd. (g).) The petition must be "supported by a
5   declaration that includes facts sufficient to establish good cause for
    the release of the juror's personal identifying information." (Code
6   Civ. Proc., § 237, subd. (b).) "The court shall set the matter for
    hearing if the petition and supporting declaration establish a prima
7   facie showing of good cause for the release of the personal juror
    identifying information ...." (Code Civ. Proc., § 237, subd. (b).)

8   "Absent a showing of good cause for the release of the information,
    the public interest in the integrity of the jury system and the jurors'
9   right to privacy outweighs the defendant's interest in disclosure."
    (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1430.) "Our
10  Supreme Court has cautioned that requests to access confidential
    juror records ' "should not be used as a 'fishing expedition' to
11  search for possible misconduct ...." ' " (*Id.* at p. 1431, citing *People
    v. Avila* (2006) 38 Cal.4th 491, 604.) We review the court's rulings
12  regarding disclosure of juror information for an abuse of discretion.
    (See *People v. Tuggles* (2009) 179 Cal.App.4th 339, 380.)

13  Here, the trial court did not abuse its discretion in denying
    defendant's request because his juror misconduct claim amounted to
14  a fishing expedition. Defendant asserts, as he did below, that the
    jurors could have seen newspaper headlines that appeared in
15  newsstands at the courthouse, or could have read one or more of the
    online articles that came out during and around the time of trial.
16  There was, however, nothing, other than speculation, that any of the
    jurors violated the trial court's repeated instructions not to view
17  media coverage during the trial. (See *People v. Gray*, *supra*, 37
    Cal.4th at p. 231 [jurors are presumed to follow the court's
18  instructions].) There was also no indication that a juror who may
    have inadvertently seen a newspaper headline would have been
19  negatively influenced by it in reaching a verdict in the criminal case,
    because the allegations in the civil lawsuit were consistent with the
20  defense theory. In light of the lack of any evidence suggesting
    impropriety or misconduct, the court did not err in determining that
21  defendant failed to meet his burden of making a prima facie showing
    of good cause for the release of juror information.
22

23  *Cutrufelli*, 2019 WL 1198874 at *10–11.

24      The California Court of Appeal's conclusion was not contrary to or an unreasonable

25  application of clearly established federal law.  To the extent Mr. Cutrufelli argues that the trial

26  court violated state law by failing to hold a hearing regarding release of juror contact information,

27  *see* Docket No. 1 at 54-63, such a claim is a matter of state law that is not cognizable on federal

28  habeas.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011); *Estelle v. McGuire*, 502 U.S. 62, 67-

United States District Court
Northern District of California

68 (1991).  The Sixth Amendment may be implicated where there is "significant" or "deliberate interference with the deliberation process." *Tong Xiong v. Felker*, 681 F.3d 1067, 1077 (9th Cir. 2012).  Examples of such misconduct include: a trial court's "refusing to consider affidavits from the jury where the bailiff had previously remarked to the jury that the victim was the third person that the defendant killed and that the defendant had been tried for his life once before" and where "the jury also considered an outside newspaper article stating that the evidence against the defendant was very strong, and that he would be lucky if he was not convicted," *id.* at 1076 (citing *Mattox v. United States*, 146 U.S. 140, 141–42, 150-52 (1892); where "someone told the foreman of the jury that he 'could profit by bringing in a verdict favorable' to the defendant in a tax evasion case," *id.* (citing *Remmer v. United States*, 347 U.S. 227, 228 (1954)); where "two deputy sheriffs . . . provided key testimony while also overseeing the jury during sequestration, during which time they built up a rapport with the jurors resulting in 'a continuous and intimate association' with the jury throughout the trial," *id.* (citing *Turner v. State of Louisiana*, 379 U.S. 466, 473–74 (1965)); and where "the bailiff told one of the jurors that the defendant was guilty and a 'wicked fellow,' and on another occasion told them that if anything were wrong with a guilty verdict, the Supreme Court would correct it," *id.* at 1076-77 (citing *Parker v. Gladden*, 385 U.S. 363, 363-66 (1966)). In *Remmer*, the Supreme Court directed the district court to hold a hearing regarding the jury foreman's comment about profiting from a verdict, which had caused the FBI to investigate that juror during the trial, after which it provided a report to the judge and prosecutor but not to the defendant.  *Remmer*, 347 U.S. at 228-230.  The Court explained:

> We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless. The sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Id.* at 229-30.

But neither the Supreme Court, nor the Ninth Circuit, has required a district court to hold an evidentiary hearing every time there is an allegation of jury misconduct or bias. *See United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993). "Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Id.* A hearing is required if there is a "reasonable possibility" of juror bias. *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003). *See United States v. Langford*, 802 F.2d 1176, 1180 (9th Cir. 1986) (hearing was not required— where the defendant's probation officer, who testified at trial but was not identified as such, was seen by jurors leaving the probation office—because the "tenuous connection between [the witness's] emergence from the probation office and knowledge of [the defendant's] prior conviction is insufficient to support a finding of a reasonable possibility that the event complained of could have affected the verdict.").

In *United States v. Halbert*, 712 F.2d 388 (9th Cir. 1983), the Ninth Circuit found that a hearing was not required to investigate an "allegation that a juror improperly considered extrinsic evidence of a newspaper article about [the defendant's] beach house" because "the jurors heard considerable evidence about the beach house and [defendant's] life style" and there was "no reasonable possibility that the newspaper article affected the verdict." *Halbert*, 712 F.2d at 389. The court noted that "[a]lthough it is usually preferable to hold . . . a hearing, in this instance, the court knew the exact scope and nature of the newspaper article and the extraneous information." *Id.*

In Mr. Cutrufelli's case, unlike in *Mattox*, *Remmer*, *Turner*, and *Parker*, there was no evidence of actual juror contact with a news article about the civil lawsuit in Mr. Cutrufelli's name; nor is there any specific allegation of misconduct or bias. Mr. Cutrufelli's argument that the jurors may have been exposed to articles about him was purely speculative, based in part on the location of the newsstands in the courthouse. The Constitution does not require hearings based on Mr. Cutrufelli's vague and attenuated allegations; at least there is no clearly established federal law so holding. *See Pha v. Swarthout*, 658 F. App'x 849, 851 (9th Cir. 2016) (habeas relief unavailable based on trial court's refusal to provide juror contact information; petitioner identified

"no Supreme Court decision addressing a defendant's entitlement to written discovery upon suggestion of juror misconduct"). *See also Mitchell v. United States*, 958 F.3d 775, 790-92 (9th Cir. 2020) (district court correctly denied a motion to interview jurors regarding racial bias when the motion was based on mere speculation and lacked any specific showing of jury misconduct or any other basis for good cause).

Further, the California Court of Appeal's holding that there would not have been any prejudice from jurors viewing the articles, because the civil lawsuit was consistent with the defense theory, was not an unreasonable determination of the facts.  There was no factual dispute at trial that Mr. Cutrufelli and the 90-year old Mr. Leone shot at each other, as Mr. Cutrufelli's defense only disputed the circumstances of the shooting, and the jurors likely viewed Mr. Cutrufelli in a less-than-favorable light that would not have been materially made worse by knowledge of the civil suit.  *See Tong Xiong*, 681 F.3d at 1073, 1078 (upholding habeas denial where trial court, after disclosing contact information for seven jurors to the petitioner, found no prejudice resulted from jurors viewing and discussing a defense witness's out-of-court demeanor because "the extraneous evidence was merely duplicative of the jury's findings on [the witness's] credibility").[11]

The state appellate court's finding that the trial court did not err in refusing to provide juror contact information to the defense or hold a hearing regarding the release of such contact information was not an unreasonable application of law or based on an unreasonable finding of fact.  Habeas relief is not available for this claim.

E.     No Certificate of Appealability

A certificate of appealability will not issue because "reasonable jurists would" not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is denied.

---

[11] The court did not address the merits of petitioner's claim in *Tong Xiong* "that the trial court deprived him of due process by informing the former jurors that they were not required to speak with the defense during its post-verdict investigation," finding it procedurally defaulted, nor his "claim that the trial court violated his rights by failing to require that all former jurors be questioned under oath," finding it "not cognizable . . . for lack of certification." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074-75 (9th Cir. 2012).

United States District Court
Northern District of California

United States District Court
Northern District of California

## VI.     CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Luis Martinez on the docket as the respondent in this action.


**IT IS SO ORDERED**.


Dated: January 24, 2022

_____
EDWARD M. CHEN
United States District Judge